**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Criminal No. 06-284 (MJD / SRN) |
| **Plaintiff,** | |
| | **REPORT & RECOMMENDATION** |
| v. | |
| Bill Africanus Wesseh, | |
| **Defendant.** | |

---

LeeAnn K. Bell, Assistant U.S. Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for U.S.A.

Reynaldo A. Aligada, Office of the Public Defender, 107 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Eyewitness Identifications (Doc. No. 18), and Motion to Suppress Evidence (Doc. Nos. 19 & 22). The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). For the reasons stated below, this Court recommends that the motions be denied.

I.      FACTUAL AND PROCEDURAL BACKGROUND

At the December 21, 2006, hearing on Defendant's pretrial motions, Detective Terry Cassem and Officer Brian Wentworth testified as to the following events. On March 2, 2006, a thin black male in his 20s entered the Anoka Hennepin Credit Union in Champlin, Minnesota. He wore a black "hoodie" jacket and something like a "doo-rag" on his head. He displayed a small revolver with wood grips in his right hand and demanded money from Sarah Erickson, one of the tellers on duty. After fleeing the bank with in excess of $12,000, he ran west toward

Champlin Drive.  Although police canines tracked the suspect to an apartment building at 11715

Champlin Drive, the police were unable to locate him.

On April 4, 2006, a black male described as being 5'8" to 5'10" robbed the same bank.

He wore a green jacket, jeans and a brown knit hat.  Again, police canines pursued the robber's

trail to the same building but were unable to apprehend a suspect.  On May 11, 2006, a black

male wearing a black stocking cap and a black and grey jacket approached the same bank but,

due to new security precautions, was asked for identification by Scott Gamble, a bank employee,

before being allowed inside.  After engaging in nervous behavior and being unable to produce

such identification, he ran away.

The following day, May 12, 2006, police were called to the same apartment building at

11715 Champlin Drive in response to a report of unwanted persons in Apartment 209.  On the

scene, officers spoke with the lessee of the apartment, who stated that he had been locked out of

his own apartment by several individuals whom he believed possessed firearms.  Police spoke

with the building manager who confirmed that the lessee was the only tenant on the lease.

Lacking a search warrant for the premises, Police obtained a key for the unit from either the

building manager or the lessee.  After knocking and waiting about thirty seconds, they used the

key to enter the apartment.

Inside they observed three black males and one female.  They also observed in plain view

a black and grey jacket on the floor of the living area and one of the officers recognized the

jacket as matching the description of the jacket worn by the suspicious black male who

attempted to enter the bank the previous day.  Defendant, along with two of other three men, told

officers that the jacket belonged to the third male.  The third male, however, stated that the jacket

belonged to Defendant.  The officers seized the jacket.

2

The next day, May 13, 2006, the lessee called the police back to the apartment and stated

he had found a small dark Iver Johnson brand revolver hidden on the premises.  Then, on May

14, 2006, police spoke with the female who previously had been inside the apartment.  She

recounted to the officers the events of a few weeks earlier.  She stated that she and Defendant

were in the apartment, but that he left only to return shortly thereafter out of breath.  He then

threw down a bag full of money in front of her, stating "this should take care of it."  She told

police that she understood Defendant to be attempting to pay her for recently having wrecked her

car.  After confirming that Defendant had recently been arrested in connection with a car crash

involving her vehicle, Police then arrested Defendant on May 16, 2006.

Detective Cassem then conducted two photographic lineups, in which Scott Gamble and

Sarah Erickson each separately identified Defendant as the individual who robbed, or attempted

to rob, the bank.  The government thus charged Defendant with robbery of a credit union and

attempted robbery of a credit union.  Defendant now moves to suppress the evidence obtained at

the apartment as well as that obtained pursuant to his arrest and to exclude the identifications

from the photographic lineups.

## II.     DISCUSSION

### A.     The Warrantless Entry Into The Apartment Did Not Violate The Constitution

Defendant asserts that the police officers' warrantless entry into the apartment where he

was found violated his Fourth Amendment rights.  (Mem. at 7-8.)  But the threshold, and

probably determinative, issue is whether Defendant has standing to assert such a violation.

Defendant simply claims that he "had a reasonable expectation that he should be protected from

unreasonable searches in his living space."  (Id. at 7.)  But as the government points out,

Defendant has failed to establish that he had a recognized expectation of privacy in the

3

apartment so as to be able to assert a Fourth Amendment violation.  (Mem. at 11.)

A defendant lacks standing to seek the suppression of evidence obtained from premises on which his "presence is 'wrongful.'"  6 Wayne R. LaFave, Search and Seizure § 11.3(b), at p. 160 (4th ed. 2004).  The record discloses that the apartment was leased by someone other than Defendant and Defendant has offered no factual support to establish he was a guest of the lessee or otherwise lawfully present there so as to have standing.  In fact, the lessee indicated that the individuals occupying his apartment refused him entrance to the premises, supporting the inference that they were not there as his guests, or that if they were once guests, they were no longer welcome.  In either scenario, Defendant would appear to lack standing.  Id. (noting that trespasser lacks standing as does a former guest who has since been asked to leave).  Perhaps most importantly here, "[t]he burden is on the defendant to establish that his presence was not wrongful."  Id. § 11.3(b), at pp. 160-61.  Defendant has failed to establish that he has standing to challenge the warrantless entry of the premises.

In any event, even assuming a proper showing of standing, the warrantless entry was not unconstitutional.  Defendant argues that the "police did not obtain the consent of the individuals living in the apartment."  (Mem. at 7.)  But the record discloses no evidence as to who, if anyone, other than the lessee was lawfully living in the apartment.  Defendant contends that the lessee himself could not consent because he "had been living in Rhode Island for two months prior to the unwanted persons call, and not in apartment 209," such that his relationship to the premises was sufficiently attenuated to preclude his "common authority to consent to the search."  (Id. at 8.)  But again, Defendant's assumption that the situation presents an issue of "common authority" is factually unfounded as there is no evidence that lessee shared a lawful

interest in the premises with anyone else.[1]

Thus the issue is solely a question of whether police had the lessee's consent.  Although the record is not entirely clear as to whether police obtained the key from the building manager or from the lessee, there is no need to resolve that question.  If they obtained the key from the sole lessee, it is clear under these circumstances that he provided his actual authority to the police to enter his apartment.

Even assuming that the police did not obtain the key directly from the lessee but rather from the building manager, they nevertheless possessed the apparent authority to enter the apartment.  Having just spoken with that lessee, who complained that he was unable to enter his own apartment due to the individuals inside, the police could reasonably believe that he had given his consent for them to enter the apartment.  Under these circumstances, whether the lessee asked the manager to give the key to the police or whether the police themselves directly asked the manager for the key is of no consequential moment.

## B.    The Arrest of Defendant Was Not Lacking In Probable Cause

Defendant also challenges his warrantless arrest insofar as it was based on information provided by the woman who was present in the apartment when police first responded to the unwanted persons call.  (Mem. at 4-5.)  Defendant asserts that there is no evidence "that police had determined whether or not [the so-called informant] was reliable.  Further, the government presented no evidence of meaningful independent corroboration of [her] story."  (Id. at 4.)

But the corroboration and reliability requirements upon which Defendant relies do not

---

[1]  Defendant relies on United States v. Brown, 328 F.3d 352 (7th Cir. 2003), to argue that the lessee here lacked "common authority" with Defendant.  But in Brown, the lessee was merely a nominal lessee, who had told the police that he did not live in the apartment, did not have the keys for it or any possessions in it, and did not pay the rent because he had leased it only as a favor to the defendant.  Id. at 354, 356.

apply here because the source of information was not the conventional "confidential

informant"–an unnamed person who is often himself a member of the "criminal milieu" and who

has provided law enforcement with tips of criminal activity.  Here, the source of the information

was not an anonymous tipster, but rather the woman the police encountered face-to-face while on

the premises.  Moreover, the nature of that information was not pure hearsay but rather her

personal observations of Defendant.  While she might have been a friend of Defendant's, there is

no evidence that she was his criminal accomplice or associate so as to undermine her reliability

or veracity.  Finally, the police independently verified the portion of her story that provided a

motive for Defendant to have robbed the bank–that he had wrecked her car.

The showings of reliability and veracity that the Defendant demands here are required, of

course, of confidential informants.  But those requirements are imposed less, if at all, on

witnesses and mere "citizen-informants" as opposed to professional informants.  2 Wayne R.

LaFave, Search and Seizure § 3.4(a), at pp. 218-21 (4th ed. 2004) (citing Jaben v. United States,

381 U.S. 214 (1965) (distinguishing between need for corroboration of narcotics informant's

credibility, and lesser need in tax evasion case); United States v. Harris, 403 U.S. 573, 599

(1971) (Harlan, J., dissenting) ("I think there is much truth in the Government's supporting

assertion that the ordinary citizen who has never before reported a crime to the police may, in

fact, be more reliable than one who supplies information on a regular basis.")).

"The lower courts have rather consistently held that the proof-of-veracity rules which

obtain in informant cases are not applicable with respect to other sources of information."  2

LaFave, supra, § 3.4(a), at p. 220.  "'[A] citizen informant is inherently more reliable than the

usual police informants who are often mired in some criminal activity themselves.'"  Edwards v.

Cabrera, 58 F.3d 290, 294 (7th Cir. 1995) (internal citation omitted).  Accord United States v.

Ross, 713 F.2d 389, 393 (8th Cir. 1983) ("We here deal with a citizen informant with no motive to falsify, rather than a professional informant, with attendant credibility concerns."); United States v. Burbridge, 252 F.3d 775, 778 (5th Cir. 2001) (stating that "[a]n ordinary citizen's eyewitness account . . . is normally sufficient to supply probable cause" without further corroboration). There is no strict requirement that the statements of an average citizen must be corroborated by law enforcement to establish the requisite reliability to support probable cause. United States v. Blount, 123 F.3d 831, 836 (5th Cir. 1997) (citing Illinois v. Gates, 462 U.S. 213, 233-34 (1983)).

Defendant also claims that there was insufficient probable cause for his arrest because most of the others present in the apartment told police that the jacket they seized belonged to one of the other occupants, not Defendant. (Mem. at 4-5.) But this fact alone does not undermine probable cause. Even assuming that the jacket did not belong to Defendant, he still could have worn that jacket during the robbery. It would appear that the purported owner of the jacket was an associate of Defendant's such that it is not difficult to conclude that Defendant could have borrowed the jacket and worn it on the day in question.

In addition, Defendant fits the descriptions provided by witnesses at the scene and was later found in an apartment at the building where the canines twice tracked the suspect. A revolver matching the description of that used in one of the robberies was located in that apartment. In sum, the police possessed the requisite probable cause to arrest Defendant without a warrant. See Beck v. Ohio, 379 U.S. 89, 91 (1964) (holding that warrantless arrest is valid if police have facts and circumstances in their knowledge sufficient to justify their belief that defendant had committed offense).

    **C.**    **The Eyewitness Identification Procedures Were Not Impermissibly Suggestive And In Any Event Were Sufficiently Reliable**

Finally, Defendant argues that the eyewitness identification procedures used by the police "were impermissibly suggestive." (Mem. at 5.) Defendant claims that in each of the two photographic lineups shown to the witnesses, he was wearing a black t-shirt while the other individuals were wearing white t-shirts, thereby creating a distinction that improperly focused the witnesses on Defendant. (Id. at 5-6.) He also asserts that this contrast between himself and those in the other photos was not negated by the overall reliability of the identifications. (Id. at 6.)

In assessing the constitutionality of photographic lineups, the courts first determine whether the procedure was "impermissibly suggestive" and, if it was, then inquire whether that procedure was nonetheless reliable, that is, whether it created "'a very substantial likelihood of irreparable misidentification.'" United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003) (internal citations omitted). The ultimate touchstone for assessing the constitutionality of such identification procedures is their reliability. Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Here, the two lineups were not impermissibly suggestive. Granted, Defendant was the only one of the six wearing a dark colored shirt.[2] But the other five were not attired in a fashion so similar between themselves so as to create any impermissibly suggestive distinction between

---

[2] Defendant relies on United States v. Wiseman, 172 F.3d 1196 (10th Cir. 1999), for the argument that "[t]his distinction alone is sufficient to demonstrate the requisite level of suggestiveness." (Mem. at 6.) But in Wiseman, the court's conclusion that the identification was impermissibly suggestive did not rely solely on the contrast between the defendant and the others in the lineup. Id. at 1208-10 (basing its conclusion on "all of the relevant factors" including the size of the photo array and the presentation of the array). Moreover, in Wiseman the contrast between defendant and the others–defendant's photo showed him "with very prominent dark circles under his eyes and with an extremely unnatural, chalk-white pallor, while the skin tones in the photos of the other five person in the array look quite natural"–was "sharp," such that he "stands out prominently from the others" so as to arouse the viewer's attention. Id. at 1209. In addition, the individuals in the other five photographs, in contrast to the defendant, all wore a similar chain around their neck, furthering the sharp contrast. Id.

them on the one hand and Defendant on the other.  Of the other five, two appear to be wearing

only a light colored t-shirt, two others are wearing light colored t-shirts under a lighter-colored

collarless shirt, and the fifth appears to be wearing a light colored t-shirt under a darker colored

shirt with a collar.  Moreover, the lineups consist of six young African-American men bearing a

general resemblance to each other.  Cf. United States v. Johnson, 56 F.3d 947, 954 (8th Cir. 1995)

(rejecting argument that lineups were impermissibly suggestive where court's review showed

that "[t]he photo spreads were comprised of African-American men with similar features").

Even assuming that this contrast was somehow impermissibly suggestive, the lineups

were nevertheless sufficiently reliable.  In assessing such reliability, the courts balance five

factors: "'the opportunity of the witness to view the criminal at the time of the crime, the

witness' degree of attention, the accuracy of his prior description of the criminal, the level of

certainty demonstrated at the confrontation, and the time between the crime and the

confrontation.'"  Williams, 340 F.3d at 567 (internal citation omitted).

Here, each of the two witnesses had a clear opportunity to directly view Defendant at

close range at the scene of the crime and, in light of the circumstances–being confronted by a

robber and a potential robber–presumably did so with an acceptable degree of attention.  The

record discloses no question as to the accuracy of their original description of the suspect, nor

any lack of certainty in their identification of Defendant.  Finally their identifications of

Defendant's photograph did not occur too long after their observations at the scene.  The teller

who was robbed on March 2, 2006, picked out Defendant's photo on May 23, 2006, and the

other bank employee identified Defendant on May 16, 2006, just days after his May 11, 2006,

encounter with the attempted robber.

### III.   CONCLUSIONS

Defendant lacks standing to challenge the warrantless entry of the apartment where he was found.  Even assuming he has standing, the police possessed actual or at least apparent authority to enter the premises.  Defendant's subsequent arrest was not unconstitutional for lack of probable cause.  Finally, the photographic lineups were not impermissible suggestive and, in any event, were sufficiently reliable.

### IV.   RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.   Defendant's motion to suppress eyewitness identifications (Docket No. 18) be DENIED; and

2.   Defendant's motion to suppress the fruits of the warrantless search of the apartment and of his warrantless arrest (Docket Nos. 19 (unredacted version) and 22 (redacted version)) be DENIED.


Dated: January 19, 2007

   s/ Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by February 5, 2007, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.